**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------- X

CAROL NOVOTNEY, DVM
                         Plaintiff,

                 - against -

STATE UNIVERSITY OF NEW YORK;
SUNY DOWNSTATE MEDICAL CENTER;
MARK STEWART, MD, PhD; MICHAEL
LUCCHESI, MD; RICHARD KOLLMAR, PhD;
ROBERT K.S. WONG, PhD,
                        Defendants.

---------------------------------------------------------------------- X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

      Plaintiff Carol A. Novotney, DVM, by her attorneys BELDOCK LEVINE &
HOFFMAN LLP, as and for her complaint and petition against Defendants State University of
New York, SUNY Downstate Medical Center (both referred to herein as "SUNY" and "SUNY
Downstate"), Mark Stewart, MD, PhD, Michael Lucchesi, MD, Richard Kollman, PhD, and
Robert K.S. Wong, PhD, alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.    This is an action for declaratory and injunctive relief and damages to redress the
deprivation of rights secured to plaintiff by applicable law, including the Fourteenth Amendment
to the United States Constitution and the New York Whistleblower Law, New York State Labor
Law § 740.  Plaintiff, a long-term employee of SUNY Downstate, brings this action seeking
damages, injunctive relief and reinstatement to her position and responsibilities as Director of the

Division of Comparative Medicine and Attending Veterinarian at SUNY Downstate, as described more fully below.

2.     Plaintiff seeks relief for the unconstitutional and retaliatory personnel actions taken against her, including summary removal from her position and responsibilities as Director, Division of Comparative Medicine (DCM) and Attending Veterinarian for animal welfare in research at SUNY Downstate, because she objected to and opposed conduct in violation of law and Public Health Service (PHS) Policy on Humane Care and Use of Laboratory Animals.

3.     Plaintiff has suffered damage and seeks relief including reinstatement and restoration to her positions, back pay, future lost earnings, compensatory damages for pain and suffering, emotional distress and mental anguish, injury to her personal and professional name, career and reputation, costs, reasonable attorney's fees, and punitive damages.

## JURISDICTION AND VENUE

4.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(4), as this action arises under the laws of the United States and seeks to recover damages and secure relief under the laws providing for the protection of civil rights.

5.     This Court has supplemental jurisdiction over plaintiff's State law claims pursuant to 28 U.S.C. § 1367(a).

6.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to plaintiff's claims took place.

## PARTIES

7.     Plaintiff is a citizen of the United States and a citizen and resident of the Counties of New York and Nassau and the State of New York. She has been employed as a veterinarian at

SUNY Downstate since September 2007 with a full time state term appointment effective April 3, 2008. Prior to September 2007, plaintiff had been continuously involved with SUNY Downstate's animal care activities for more than 12 years as a consulting and emergency back-up veterinarian.

8.      From September 13, 2013 until February 21, 2017, plaintiff was in charge of the laboratory animal facilities maintained by and at SUNY Downstate.  While employed at SUNY Downstate, plaintiff has held the position of Attending Veterinarian and/or Veterinarian of Record for USDA registration and Public Health Service Policy/NIH Assurance, and NYS Registration as well as Director, Division of Comparative Medicine.

9.      Defendant State University of New York is a corporation created by the State of New York to provide state-funded higher education.  At all times relevant hereto, SUNY was and is a public employer with its central administration located in Albany, New York.

10.     Upon information and belief, defendant SUNY Downstate Medical Center ("SUNY Downstate") is one of several university medical centers in the SUNY system.  At all times relevant hereto, SUNY Downstate was and is a public employer located in Brooklyn, New York.

11.     SUNY Downstate has extensive scientific research programs.  Upon information and belief, SUNY Downstate receives government funding for its research of millions of dollars annually, much of which comes from grants from federal agencies, including the Department of Health and Human Services, which includes the Public Health Service and the National Institutes of Health.

12.     SUNY Downstate's animal research program includes research on diverse laboratory animal subjects, including nonhuman primates (juvenile and adult monkeys), guinea pigs, rabbits, mice, rats, fruit bats, ferrets, nurse sharks, sheep, swine, zebrafish and frogs.

13.     SUNY Downstate's animal research program is governed by numerous federal and state animal welfare laws and regulations. It is also governed by the Public Health Service Policy on Humane Care and Use of Laboratory Animals both directly and as a requirement of its federal contracts.   See 48 C.F.R. 370.401.   A Full Animal Welfare Assurance, which is the type of assurance SUNY Downstate has given the federal government in connection with contracts, describes, inter alia, the institution's occupational health program.   48 C.F.R. 370.402.   As described in detail below, upon information and belief, SUNY is in breach of certain requirements of the PHS Policy and its Animal Welfare Assurance in ways that affect animal and human health and safety.

14.     Federal law requires institutions engaged in research involving laboratory animals to designate an "Institutional Official" (IO) who has the legal authority and responsibility to commit the research program and facility to meet the requirements of the Animal Welfare Act regulations (AWAR), Public Health Service (PHS) Policy, and NIH Guidelines.   The President or Chief Executive Officer (CEO) designates the IO, or becomes the IO if a designation is not made. The IO is responsible for allocating organizational resources to maintain a smoothly functioning animal care and use program which is compliant with all federal and state animal welfare laws, regulations, policies, guidelines and standards.

15.     Federal law also requires that institutions such as defendant SUNY which use animals for research shall establish an Institutional Animal Care and Use Committee (IACUC) which is qualified through the experience and expertise of its members to oversee the institution's animal program, facilities, and procedures, as described in more detail below.

16.     Defendant Michael Lucchesi is currently the Chief Officer in Charge functioning as the interim President of SUNY Downstate until April 3, 2017, when Wayne Riley will become President.

17.     Defendant Mark Stewart was appointed by SUNY Downstate's defendant Lucchesi in 2016 as the IO charged with the responsibility of the IO under Federal law; USDA animal care and OLAW were informed of the change in November 2016. Defendant Stewart is the current IO as well as Dean of the School of Graduate Studies and Vice Dean for Research. On August 18, 2016 Defendant Lucchesi appointed Defendant Stewart as Interim Provost, in addition to Chief Operating Officer (State) and Operations Manager (Research Foundation). Defendant Stewart is also Professor of Physiology and Pharmacology in which capacity he has and continues to conduct research involving animal subjects including sheep, swine, mice, rats and fruit bats.

18.     Defendant Richard Kollmar Ph.D, is an Associate Professor in the departments of Cell Biology and Otolaryngology. He conducts research using animal subjects including rats and zebrafish. Defendant Kollmar's wife Rena Orman PhD is a Research Assistant Professor using animal subjects (rats and fruit bats) in defendant Stewart's lab.  Defendant Kollmar is a member of the IACUC Committee.

19.     Defendant Robert K. S. Wong, Ph.D.,is Distinguished Professor and Chairman of the Department of Physiology and Pharmacology, and Neurology. He is an animal researcher using rodent animal subjects.

20.     At all times relevant to the allegations in this Complaint, defendants Stewart, Lucchesi, Wong and Kollmar  were agents of defendant SUNY and were acting with the consent, authorization, permission, and ratification of SUNY Downstate.

## FACTUAL ALLEGATIONS

**Plaintiff's Qualifications, Responsibilities and Job Performance**

21.     Plaintiff received a Master's of Science Degree from Rutgers University in 1978 and a Doctor of Veterinary Medicine (DVM) degree (magna cum laude) from the Tuskegee University School of Veterinary Medicine in 1987.

22.     Plaintiff has extensive training and experience in the field of laboratory animal medicine, veterinary internal medicine and veterinary oncology completing an Internal Medicine Residency Program in Veterinary Oncology at the North Carolina State University, College of Veterinary Medicine and her post-doctoral fellowship in Comparative Medicine at Rockefeller University. Plaintiff received board certification and became a Diplomate of the American College of Veterinary Internal Medicine in 1993.

23.     Plaintiff has held several positions at academic institutions including Clinical Instructor in Veterinary Oncology at North Carolina State University, College of Veterinary Medicine, Associate Director of the Rockefeller University Laboratory Animal Resource Center and Director of Office of Veterinary Resources at New York University.

24.     Plaintiff joined the Division of Comparative Medicine (DCM) at SUNY Downstate in 2007 as Associate Director/Clinical Veterinarian. She was appointed Interim Director and Attending Veterinarian in September 2013.

25.     Plaintiff has provided leadership to complete major animal facility renovations and the most recent accreditation triennial inspection (October 2014) by the Association for Assessment and Accreditation of Laboratory Animal Care (AAALAC). Most recently, plaintiff has commenced preparations for the upcoming AAALAC accreditation site visit in October 2017 and has assisted the SUNY Downstate IACUC is accomplishing the transfer of IACUC

administrative and compliance support from DCM to the recently established Office of Animal Welfare (OAW) as per AAALAC accreditation requirements.

26.     There is and was a great deal of status and prestige attached to plaintiff's positions as Attending Veterinarian and Director, Division of Comparative Medicine.  SUNY Downstate is one of the top medical colleges in the city, and it has an active biomedical research program, which receives significant funding and includes leading scientists and researchers. Under plaintiff's oversight and direction, SUNY Downstate's DCM is able to support the Downstate Biotechnology Initiative by providing animal facility and research resources to scientists from the SUNY Downstate Biotechnology Incubator and the Science and Technology Center at the Brooklyn Army terminal (BioBat).

27.     Plaintiff has performed her professional and employment responsibilities at SUNY Downstate in an exemplary manner.  She supervises a staff of 26 employees, and a 45,000 sq. ft. facility with an annual census of 23,940 animals and an operating budget of $1.8 million.

28.     Plaintiff's accomplishments are extensive and go far beyond what would typically be expected from a Director of an animal research facility. Until the creation of the Office of Animal Welfare (OAW) in 2015, plaintiff ensured the provision of administrative support to IACUC functions.  Plaintiff has accomplished the following, inter alia:

Programs:

(a)     Identified Animal Care and Use Program and Research Facility deficiencies as well as short term and long term plans to address noncompliance;

(b)     Created Animal Care and Use Program description according to AAALAC requirements and developed plan to achieve AAALAC accreditation;

(c)     Redesigned animal research protocol review forms and veterinary medical records to facilitate IACUC review, increasing federal and state regulatory compliance and improving animal welfare;

(d)     Improved SUNY's relationship with regulatory inspectors;

(e)     Improved SUNY's reputation within the Manhattan-based research community;

(f)     Provide ongoing support to the Downstate Biotechnology initiative;

(g)     Implemented database to track IACUC meetings and actions, animal purchases, procedures and protocol related activities in accordance with federal regulations;

(h)     Implemented an online mechanism for submitting animal orders and technical requests; and

(i)     Implemented a cost accounting system to track all animal research facility income and expenditures for purposes of auditing and cost analysis to establish per diems consistent with the Cost Analysis and Rate Setting Manual for Animal Research Facilities, The National Center for Research Resources (May 2000).

Animal Care:

(a)     Restructured daily routine animal care to be compliant with animal welfare regulations and consistent with current veterinary standards

(b)     Improved the well-being of monkeys housed on the SUNY  campus by creation of an environmental enrichment program which includes implementation of social housing for monkeys;

(c)     Wrote and implemented Standard Operating Procedures for daily animal care and veterinary medical care procedures;

(d)     Implemented specialized ventilated equipment for housing animals to improve the stability of housing conditions and to improve the personnel environment while working in rooms;

(e)     Reduced the noise level of daily facility operations;

(f)     Implemented a flag system for daily monitoring of animal health by veterinary technicians; and

(g)     Obtained funding for facility perimeter security installation and monitoring and to refurbish cage processing equipment to improve staff efficiency.

Personnel, Protocols and Research

(a)     Implemented a research procedure library including approximately 200 protocol operating procedures available for laboratory training and protocol renewal;

(b)     Invited to give lectures at national and local laboratory animal medicine meetings regarding environmental enrichment programs, social housing of nonhuman primates, working with the USDA as a resource, and the role of the Attending Veterinarian;

(c)     Improved the successful outcome of complex research studies of the brain by analyzing and improving methods used by scientists; provided training of research personnel conducting the procedures and studies; and

(d)     Trained Veterinary Technical staff to provide surgical and anesthesia support to studies with USDA covered species facilitating the conduct of novel research and training by faculty. Established the highest level of technical research support provided by DCM staff.

29.     Plaintiff's commitment to and superior work performance at SUNY Downstate have been recognized and commended. In 2012 Plaintiff was awarded SUNY Downstate's Extraordinary Woman of the Year award after being nominated by Sam Adams, DVM then Attending Veterinarian and Richard Sinert, DO then Chair of the Institutional Animal Care and Use Committee. During the October 2014 AAALAC accreditation site visit inspection, the participating site visitors commended plaintiff for her leadership and administration of the Division of Comparative Medicine. She has authored recent articles with current faculty at SUNY Downstate and in the past, she has authored articles on novel cancer treatment modalities for spontaneously occurring tumors in companion animals. She has served as a veterinary research policy and facility design consultant at other research programs in the NY Metropolitan area.

30.     Plaintiff's efforts were so successful that she has been able to successfully maintain the research program's AAALAC accreditation throughout the phased renovation of over 30,000 sq. ft. of facility space without research interruption. In addition plaintiff was successful in obtaining approximately $1 million combined from both NIH and SUNY Downstate to upgrade the housing of animal research subjects to individually ventilated caging units, thereby improving the environment of the animal subjects while at the same time reducing the exposure of research staff to animal related allergens while working in the facility.

31.     In the years she has worked at SUNY Downstate, plaintiff has received merit increases when available.

32.     At no time during years that she has worked at SUNY Downstate has plaintiff received a negative review or evaluation; plaintiff has received letters of appreciation from research faculty and from her staff.

**SUNY Downstate's Institutional Animal Care and Use Committee**

33.     The Animal Welfare Act, 7 U.S.C. § 2131 et seq., and the Health Research Extension Act of 1985, 42 U.S.C. § 275 et seq., provide in relevant part that one of their purposes is to insure that animals intended for use in research facilities are provided humane care and treatment.  Regulations promulgated under the Animal Welfare Act and the Health Research Extension Act of 1985 provide that institutions such as defendant SUNY which use animals for research shall establish an Institutional Animal Care and Use Committee (IACUC) which is qualified through the experience and expertise of its members to oversee the institution's animal program, facilities, and procedures.  Each IACUC is to have as a member at least one veterinarian with training or experience in laboratory animal science and medicine, who has direct or delegated program authority and responsibility for activities involving animals at the institution.

34.     The IACUC at SUNY Downstate is composed of 8 members, including SUNY faculty and support staff and representatives from the community.  As Attending Veterinarian, plaintiff is a member of the IACUC with direct authority and responsibility for all activities involving animals at SUNY Downstate's Brooklyn campus.

35.     Pursuant to the regulatory scheme set out under the Animal Welfare Act and the Health Research Extension Act of 1985, described above, the IACUC was plaintiff's supervisor in the area of enforcing compliance with federal law relating to the use of laboratory animals in research at defendant SUNY Downstate.

36.     Pursuant to the regulatory scheme set out under the Animal Welfare Act and the Health Research Extension Act of 1985, described above, both the veterinarian of record and the animal care and use committee report to the IO regarding the state of the animal care and use program and make recommendations to both maintain and improve animal welfare and correct any deficiencies.

37.     Thus, the IO was plaintiff's supervisor as well.

38.     While the IO is the responsible entity for the animal care and use program, the veterinarian of record and the institutional animal care and use committee take the measures required to ensure regulatory compliance. During USDA and New York State DOH inspections, it is the Veterinarian who represents the University animal research program and accompanies the USDA Veterinary Medical Officer and the NYS inspector during the multiple day inspections of facilities and records.

39.     It is the responsibility of the attending veterinarian, OAW and the IACUC to monitor the research of scientists working with laboratory animals and to make sure that they comply with all legal requirements relating to the use of laboratory animals.

40.     Plaintiff has raised concerns about the care and treatment of these animals as described in more detail below.

41.     Also as described in more detail below, plaintiff became aware that certain scientists as well as members of the SUNY administration were unhappy that plaintiff was raising these concerns.

42.     Plaintiff believes that she has been removed from her position for continuing to raise these and other regulatory concerns as described below.

**SUNY Downstate's Reporting and Anti-Reprisal Policy**

43.     SUNY Downstate has an internal reporting mechanism and anti-reprisal policy posted on its website at http://research.downstate.edu/iacuc/iacuc.html as a result of the 2014 AAALAC accreditation site visit:

Institutional Animal Care and Use Committee (IACUC)

The use of animals in research is a privilege. This privilege is granted to those investigators and programs that commit to meeting the highest ethical and regulatory standards. Investigators conducting research with animal subjects have an ethical and legal responsibility (PDF) to ensure they are treated humanely. The system of animal research oversight in the United States consists of a framework of federal, state, local, and institutional requirements.

The SUNY Downstate Medical Center animal care and use program has been accredited by the Association for Assessment and Accreditation of Laboratory Animal Care (AAALAC, International) since 1966. Both Federal and State animal welfare laws, regulations, policies and guidelines, place great emphasis on the importance of the Institutional Animal Care and Use Committee (IACUC) in self-regulation and accountability of research programs. The most crucial responsibility of an IACUC is to ensure that all procedures in all research projects are designed to minimize pain and/or distress to animals. The Federal and State mandated research review process by the IACUC is to assure humane treatment and compliance with internationally accepted and government mandated animal welfare standards. The IACUC conducts its review by asking very specific questions pertaining to animal welfare which are in turn integrated into the research itself. The IACUC provides Scientists with standardized forms to facilitate this process. These forms are regularly updated to reflect new policies and requirements of the animal welfare regulatory agencies.

Reporting Animal Welfare Concerns:

Any animal welfare concerns pertaining to the use of animal models in research at SUNY Downstate can be reported to the IACUC, the Office of Animal Welfare, or anonymously with SUNY Compliance Line (1-877-349-SUNY, 1-877-349-7869). Strict confidentiality is maintained regarding the source of concerns, and personnel reporting concerns in good faith are protected from reprisal.

44.     Concerns are channeled to defendant Stewart.

**SUNY Downstate's Animal Care Program under Defendants Lucchesi and Stewart**

45.     During the tenure of former SUNY President Williams, and the leadership of three previous Institutional Officials appointed by President Williams, plaintiff was able to fulfill her

regulatory responsibilities in a manner which developed and continued programmatic excellence and regulatory compliance.

46.     After defendant Lucchesi became the Officer in Charge and appointed defendant Stewart to the position of IO, SUNY Downstate's animal care and use program began to receive less favor and focus from the SUNY Downstate administration, as evidenced by slow-to-non-responsive action to prevent and correct noncompliant items and issues.

47.     Among other things, problems related to the physical plant, including ceiling water leak into the facility from the mechanical spaces above and unstable Heating, Ventilation Air Conditioning (HVAC) conditions, have persisted since March 2016. Animal housing room doors have had to be left ajar because not having enough air in many of the rooms creates a vacuum resulting in loud whistling sounds from the hallway through the doors when closed that disrupt the animals housed within. The housing room doors should be closed and locked for biosecurity but cannot be given the current environmental instability.

48.     Concerned about the administration's lack of attention to the animal research program, plaintiff, with notice to and full knowledge of the IACUC, has written to defendant Stewart on numerous occasions over the last year providing photos of facility damage caused by leaks in key areas of the facility and advising him of several of her concerns, including but not limited to increasing areas of noncompliance with the Animal Welfare Act as a result of the administration's unwillingness to address facilities and programmatic issues. Each time an animal housing environmental problem was identified by the DCM operations manager, defendant Stewart was notified along with the IACUC Chair. This has occurred over the last few months, sometimes as frequently as several times a week.

49.     Defendant Stewart was already aware of some of the issues and problems as a result of prior communications from plaintiff (and, upon information and belief, others).

50.     Three times since November 2016, plaintiff met with defendant Stewart in his role as IO.

51.     In addition to the issue of the leaks described above, issues of concern raised by plaintiff in recent meetings included:

(a)     compromised regulatory compliance and programmatic efficiency as a result of the lack of defendants' final approval of changes in DCM animal care staff supervision as instituted by plaintiff to provide greater daily oversight of animal care by one of her staff;

(b)     plaintiff's need to know specific faculty animal care/welfare  concerns in order that they could be expeditiously addressed by DCM. Defendant Stewart referred to "tons" of complaints about DCM and animal care from faculty but refused to say what those were. Plaintiff met with defendant Stewart as recently as February 1, 2017 to address these concerns. On that occasion, defendant Stewart described them as  "rumors" but would not reveal any details; and

(c)     the obvious conflict of interest in having plaintiff report to defendant Stewart who is an animal researcher who in the past has had his own animal welfare noncompliance issues which plaintiff was required to address.

52.     Upon information and belief, the most recent USDA APHIS/animal care visit on February 23, 2017 cited violations specific to defendant Stewart's animal subjects and research protocols Upon information and belief, the appointment of defendant Stewart to  fill  the role of IO has resulted in a persistence of institutional programmatic deficiencies including but not limited to a lack of understanding of investigator responsibility in the conduct of animal welfare in accordance with current animal welfare laws and regulations.

53.     Upon information and belief, the performance of the SUNY  IO was and is contrary to accepted industry standards which provide that "The IO should…  clearly define and assign responsibilities and reporting channels for … essential program elements such as personnel training, occupational health and safety, and maintenance of facilities."

**Plaintiff's Specific Concerns about Welfare of Animal Subjects used by Faculty including Faculty under Physiology and Pharmacology Department Chair Defendant Wong**

54.     Plaintiff has expressed additional specific concerns about animal welfare, including but not limited to the following*:*

(a)      Animals hidden in scientists' office and labs;

(b)     Failure to submit protocols for required review resulting in expiration of protocols and requiring plaintiff to block  procedures on animals without approved protocols;

(c)     Lack of anesthesia during surgery on animals and failure to maintain surgical records showing post-operative analgesia

(d)     Faculty justifying not giving analgesic because it is "inconvenient";

(e)     Faculty failing to accurately track number of animals used on a protocol resulting in 2-3 times approved number;

(f)     Faculty failing to use proper breeding methods for mice resulting in severe overcrowding and animal death;

(g)     Faculty lab staff in the animal housing rooms without proper personal protective equipment to protect both themselves and animals;

(h)     Surgical methods conducted on animals without prior review and approval by the IACUC;

(i)     Failure of specific Physiology/Pharmacology faculty to contact veterinarian when they find an animal in distress resulting in death of the animal; and

(j)     Lack of preparation of research staff prior to surgery resulting in prolonged procedures, trauma and animal death.

55.     Consistent with her professional responsibilities, plaintiff voiced her concerns about these veterinary issues in the course of duly scheduled meetings of the IACUC based on review of protocols and post approval monitoring.

56.     In addition, plaintiff sought advice from outside scientists, vendors and animal welfare agencies.

57.     Relevant federal guidance includes:

(a)     A word from USDA and OLAW in Lab Animal 40, 11 (2011)(Animal researchers must be objective in their actions and diligent in following the rules and mandates established by regulatory authorities. The purpose of an Animal Use Protocol is to put into place the exact procedures for a given study and to ensure that they comply with the established guidelines. … To work outside the approved protocol is unacceptable . . . . The research facility should have a mechanism in place for veterinary contact and care on weekends and holidays or in the event of an emergency. This information should be clearly conveyed to facility personnel and investigators to ensure that they are familiar with the appropriate personnel and procedures for handling veterinary emergencies.)

(b)     Code of Federal Regulations, Title 9, Chapter 1, Subchapter A — Animal Welfare: Part 2 Regulations (§2.33b).

(c)     Institute for Laboratory Animal Research. Guide for the Care and Use of Laboratory Animals 46 (National Academies Press, Washington, DC, 1996). Chester Gipson, DVM Patricia Brown, VMD, MS, DACLAM Deputy Administrator Director USDA, APHIS, AC OLAW, OER, OD, NIH, HHS.

58.     Plaintiff had particular concerns in and around July 2015 with Research Assistant Professor Andrea Bibbig, a faculty member in the Department of Physiology and Pharmacology. Dr. Bibbig did not submit her annual research protocol renewal for review as required. Again in March 2016 she did not submit her PHS required 3 year review to the IACUC allowing it to expire, which prevented her from using her animals. Defendant Wong voiced his upset to defendant Stewart that plaintiff took the required animal welfare action.

59.     Notwithstanding the difficulties, plaintiff has made efforts to bring harmony to her work with the faculty as evidenced by requests to meet with defendant Wong and his department faculty and defendant Stewart. Plaintiff also created a modern and fully equipped suite to be used by faculty for their animal subject procedures and surgery. The suite was established immediately adjacent to the Veterinary Technicians work space so they may be able to provide technical support to the faculty to improve animal welfare and their research procedure results. Many faculty have been very appreciative of this high level of research support with integrated efforts toward improving animal welfare but as described below, plaintiff encountered increasing opposition from

faculty in the Department of Physiology and Pharmacology under defendant Wong and from defendant Kollmar.

60.     Plaintiff is also concerned about defendants' breach of confidentiality obligations. Under federal law, IACUC meetings are confidential and no one is to participate in the meeting if he or she has a conflict of interest.  See USDA AWR 9 CFR Part 2, Subpart C §2.31(d)(2). Upon information and belief, defendant Kollmar has been providing information from IACUC meetings that is being used in a negative way by defendant Stewart against plaintiff.

**Defendants' Opposition to Plaintiff and Animal Welfare Compliance**

61.     Not only has plaintiff's commitment to animal welfare not been supported by defendant Stewart in his roles as researcher and IO, but in addition, he along with several faculty in the Department of Physiology and Pharmacology including defendant Wong and Dr. Bibbig, have openly stated the view that compliance with animal welfare laws, regulations, policies and guidelines "interferes with research".

62.     Defendant Wong stated during a meeting on March 3, 2015 that plaintiff should "step back and let researchers do what they want". Plaintiff responded in writing in an email to clarify her responsibilities for animal welfare.

63.     At times the behavior from specific faculty to plaintiff and/or her staff was outwardly hostile, such as obscenities being shouted at plaintiff's staff. Plaintiff and DCM staff reported the actions to Office of Labor Relations (OLR) and the faculty member at issue received disciplinary action including probation which concluded in the fall of 2016.

64.     The same scientist, Dr. Bibbig, directly said to plaintiff that she and other faculty would "get" plaintiff.

65.     At an Advisory Committee on Research (ACOR) meeting on August 2, 2016, defendants Lucchesi and Stewart stated that they and Albany leadership were concerned about the drop in Downstate's extramural funding.  Defendant Wong faulted the compliance process for making it difficult to see what is best for SUNY projects. All subsequent ACOR meetings excluded plaintiff and administrators involved in research compliance. Plaintiff raised concerns about the exclusion to the ACOR Chair Jack Dehovitz in an email which he indicated he shared with defendants Lucchesi and Stewart.

66.     On November 8, 2016, another scientist asked to speak to plaintiff to warn her that some faculty were very angry at her and "conspiring" against her. She said she could not imagine what plaintiff may have done as she has always been helpful to her and the animal researchers from the BioBAT and Downstate Incubator.

67.     On February 1, 2017, an IACUC Compliance subcommittee meeting took place to discuss animal welfare noncompliance problems on protocols from Drs. Beckles and Mascareno. At the meeting, defendant Kollmar was verbally aggressive to plaintiff and accused her  of not helping a faculty member during a 14 minute surgical procedure involving a mouse. Another faculty member defended plaintiff and said that defendant Kollmar's expectations were ridiculous. He stated that it is the scientist's responsibility to know how properly to conduct procedures on animals. Plaintiff stated that she has to be able to trust faculty and that during the 14 minute procedure she gave the faculty member the benefit of the doubt until she noted that the trachea had been perforated and the animal was not being properly ventilated at which time she stopped the procedure. During a later meeting requested by OLR, plaintiff was told she was not helpful to these two faculty members but rather observed them work on a mouse for 14 minutes then wrote a negative report about her observations. Not only was this information inaccurate but in addition

plaintiff did not author the report. The process was a standard and required post-approval review which typically involves monitoring as was done by plaintiff.

68. Upon information and belief, defendant Kollmar has been the member of the IACUC who has said negative things about plaintiff in IACUC meetings and to others not in the meetings, including but not limited to defendant Stewart, identifying plaintiff as the "problem". Defendant Kollmar's wife Rena Orman works directly with Mark Stewart on his research projects and is also responsible for authorship of all defendant Stewart's research protocols submitted to the IACUC for review, another conflict of interest.

69. Plaintiff believes that defendants specifically object to her commitment to the relief of animal subject pain and suffering, to the implementation of the new standards of the 8th edition of the Guide for the Care and Use of Laboratory animals (2011) and to her following biosecurity and occupational health and safety standards.

**Plaintiff's Removal from her Positions as Attending Veterinarian and Director, Division of Comparative Medicine**

February 15-17, 2017

70. On Wednesday February 15, 2017, plaintiff noted that several of her staff were not in the animal facility conducting their animal care responsibilities. She then learned that they were being called to appear at OLR. Plaintiff was not given advance notice that her staff would be leaving their animal care responsibilities in the facility and for how long. Several of plaintiff's staff returned from OLR upset by extremely negative comments being made by Leonzo Cuiman, Assistant Vice President for Labor Relations, who also told them that the questioning was at the request of defendant Stewart. These staff members told plaintiff that Mr. Cuiman told them:

    (a)    that plaintiff had many complaints against her by faculty for interfering with and not supporting research;

(b)     that plaintiff exhibited abusive behavior toward others such as hitting and shouting obscenities;

(c)     that plaintiff bullied and intimidated DCM staff;

(d)     that plaintiff had an argument with former SUNY Downstate Executive VP and Institutional Official Astra Dowell during which Ms. Dowell considered calling the police; and

(e)     that "it did not look good" for plaintiff.

71.     IACUC Chair Dr. Diana Dow-Edwards was also called to the OLR office that same day.  Among other things, Mr. Cuiman asked if there had been any problems lately and mentioned the names of Drs. Beckles and Mascareno .  Dr. Dow-Edwards stated that the faculty members were out of compliance, with a substantial number of animals dying, and that the lab members did not know the details of their protocol, nor were they proficient in performing the procedures on the animals. Mr. Cuiman specifically asked about the 14 minute mouse and asked why plaintiff didn't intervene. Dr. Dow-Edwards told plaintiff she felt that Mr. Cuiman was encouraging her to say that plaintiff acted inappropriately.  Upon information and belief, she did not say that and did not believe that.

72.     Concerned about what she was hearing from DCM staff, at 10:45am Thursday February 16, 2017, plaintiff sent an email to defendant Stewart and bcc'd defendant Lucchesi and other administrators to state her concern and request clarification as to what was happening and why OLR was taking actions which appeared to be directed against her

73.     Plaintiff did not receive a response from defendants Stewart or Lucchesi.

74.     On Thursday afternoon, February 16, plaintiff was called by Carol McDonald of OLR to come to the OLR office to pick up a letter. The letter dated February 15, 2017, was signed by Leonzo Cuiman, Assistant Vice President for Labor Relations and was captioned "Investigation of Possible Disciplinary Charges". It directed plaintiff to report to the office of labor relations on

Thursday February 23, 2017 "to discuss the allegations of creating a threatening and hostile work environment and related matters."  It informed plaintiff that she was entitled to be represented by the United University Professionals (UUP) or an attorney and that it was her responsibility to contact UUP to arrange for representation.  Plaintiff called UUUP but was not able to speak to a representative when she called.

75.     On Friday February 17, 2017 plaintiff spoke with University Counsel and asked him if he could tell her what was happening. He said he could not but he did say he knew nothing about the actions against plaintiff. He sounded dismayed, presumably because of his awareness of previous false allegations and threatening behavior on the part of Physiology and Pharmacology faculty against plaintiff and others.

76.     On Friday February 17, 2017 at 4pm, plaintiff received a call from Carol McDonald at OLR asking her to come immediately to OLR.  Plaintiff asked what the subject was and Ms. McDonald said she did not know. Plaintiff asked if the requested meeting could be postponed and was told no. She asked who would be there and how long the meeting would take; the answer was Leonzo was there and the meeting would be brief. Plaintiff went over and met with Mr. Cuiman for approximately 50 minutes. Mr. Cuiman began the meeting by saying "chicken little, the sky is falling..." He said some of plaintiff's staff came over that afternoon to complain about how she bullied and intimidated them at her staff meeting that morning. Plaintiff said this was not true.

77.     Plaintiff explained to Mr. Cuiman that she called the meeting with her staff to tell them herself that she had been notified that she was being investigated for disciplinary actions; that labor relations might call them to go over to OLR; that they should not be afraid or intimidated as they have done nothing wrong; and that they should speak honestly. Plaintiff also told them that she thought the faculty was pushing back against animal welfare rules and compliance. She ended the

meeting by telling each person the good things they brought to the program and how she appreciated all they do and for them to keep doing their jobs.

78.     Among other things, Mr. Cuiman asked plaintiff if she was tenured and mentioned the issue of job security for term employees.  He indicated that plaintiff should have the sense that this was "not working out" and indicated he had to do what he was told to do even if he didn't agree with it.

79.     Although Mr. Cuiman asked about plaintiff's work plans the following week, he did not issue a directive to plaintiff not to go back to her office.  Plaintiff did not leave the meeting either with the understanding or a written directive not to return to her workplace the following week.  Accordingly, plaintiff believed that she could return to work on Tuesday February 21, after the Monday February 20 President's Day holiday, which she did.  See discussion below.

80.     Plaintiff later learned that defendant Stewart spoke to Dr. Scharf, a veterinary colleague of plaintiff's, that same day Friday February 17.  Defendant Stewart told Dr. Scharf, plaintiffs veterinary colleague that plaintiff had been "suspended"(later confirmed by plaintiff in discussion with Dr. Scharf)  and asked Dr. Scharf to become the Attending Veterinarian on a consulting basis. A "program of Veterinary Care" (PVC) required by USDA to be established by consulting veterinarians who are not fulltime at an institution was signed by defendant Stewart and Dr. Scharf on Friday February 17, 2017.

81.     Upon information and belief, Dr. Scharf was on vacation and his assistant Dr. Larsen was unaware of any agreements Dr. Scharf had made with Downstate.

82.     In reviewing the PVC, plaintiff continues to be concerned about the type of veterinary care that defendant Stewart has requested of Dr. Scharf. The PVC referred to species that are not part of the SUNY Downstate research program. Additionally the PVC does not

accurately reflect the NYS requirements for the quarantine testing on nonhuman primates imported into the state. Additionally, there is a method of euthanasia for USDA covered species that is not permitted at Downstate.

February 21-February 24, 2017: Plaintiff Becomes "Persona Non Grata"

83.     On the morning of Tuesday February 21, 2017, plaintiff met with one of her veterinary staff to inform them of her schedule for the day and that she would be leaving around 1pm. Later that day at around 3:00pm plaintiff received a phone message from OLR directing her to come to OLR with her personal belongings. At the time, plaintiff was not even in Brooklyn. Plaintiff attempted to reach UUP but was not immediately able to reach the union.

84.     Later on February 21, at around 5:30 pm, plaintiff was able to access her email account and found an email with an attached letter dated February 21, 2017 from OLR Assistant Vice President Leonzo Cuiman with the subject line "Persona Non Grata". The letter states, among other things:

> …effective immediately, you are directed not to be on the premises of the State University of New York- Downstate Medical Center, including your work site, until you meet with me on Thursday, February 23, 2017……..If any reasons necessitate your coming to SUNY Downstate Medical Center, you are directed to make an appointment with the Office of Public Safety….you must be escorted to and from the office you are scheduled to visit

85.     Plaintiff was not at that time or since allowed to make arrangements for the animals for which she had been responsible in her position as Attending Veterinarian.

86.     On Wednesday February 22, 2017, plaintiff was told by a member of her staff that defendant Stewart came to the weekly Wednesday DCM administrators meeting and told everyone that he was now in charge of the facility. He indicated that the Attending Veterinarian is now Bruce Scharf from Rutgers and that when he is not available, Douglas Larsen will be. When asked what to do if there is a veterinary emergency, defendant Stewart indicated that the information should

be given to Lydia Bailey who will then contact defendant Stewart and he will decide what to do and who to contact.

87.     On Thursday February 23, 2017 after being advised by UUP to avoid direct communication with Mr. Cuiman at OLR, plaintiff offered the following objection to the Persona Non Grata Declaration:

> As the Attending Veterinarian and the signatory in that capacity to the Federal government and State DOH, I am very aware of the importance of following laws, rules and directives. I am writing to strongly object to Leonzo's February 21 "Persona Non Grata" letter to me. When Leonzo instructed me to come to his office at 4pm on Friday February 17, without prior notice or UUP representation, Leonzo told me many upsetting things. I never understood him to instruct me not to return to my worksite nor meet with any of my staff concerning the disciplinary case under his investigation. I believed I had every right to go to my work place on Tuesday February 21 and had no understanding that by going to work on that day that I was in violation of any directive. I am distressed that I am being characterized as a "Persona Non Grata" following all my efforts to assure that animal research at SUNY Downstate is in compliance with mandated federal and state animal welfare laws, regulations, policies and guidelines. As Attending Veterinarian I have many responsibilities and I am very concerned about the welfare of the animals at SUNY Downstate.

88.     In addition, the abruptness of plaintiff's Persona Non Grata designation hindered the transfer of information from plaintiff to her staff who remain responsible for animal care which, upon information and belief, was and is likely to have a negative impact on both animal care and AWA regulatory compliance at SUNY Downstate.

**Related USDA Actions**

89.     On Tuesday February 21, 2017 plaintiff spoke to USDA inspector John Lopinto to inform him that she was barred from the animal facility and was concerned about animal care. Dr. Lopinto went to Downstate on Thursday February 23, for an inspection. He asked who is in charge and was told Mark Stewart.

90.     Upon information and belief, defendant Stewart told the USDA inspector that Dr.

24

Scharf is now the Attending veterinarian but that he was on vacation. The USDA inspector was provided with the program of veterinary care ("PVC") signed on February 17, 2017 by Dr. Scharf and defendant Stewart. Upon information and belief, defendant Stewart told the USDA inspector that plaintiff was suspended, as he had previously told Dr. Scharf.

91.     Upon information and belief, the USDA inspector met with the Executive VP for Research and the Dean of the College of Medicine to try to understand the institutional organizational reporting structure as it relates to the IO who is also an animal researcher who is now in charge of the animal facility and indicated that this is a conflict of interest.

92.     Upon information and belief, the USDA inspector also met with the Interim President (Officer in Charge) defendant Lucchesi and informed him of defendant Stewart's conflict of interest.

**Defendants' actions present substantial and specific dangers to public health and safety, as well as to animal health and safety**

93.     Plaintiff's efforts were at all times made in furtherance of public health and safety.

94.      Research on laboratory animals is performed to benefit human health and public health, inter alia.  Upon information and belief, inadequately trained scientists and unhealthy animals potentially compromise the benefits to human health that may be gained from research on laboratory animals.

95.      Defendants' activities described above presented and continue to present substantial and specific dangers to public health and safety.

95. Inadequate training of individuals who handle and work with animals imperils public health and safety. The current status of veterinary care at SUNY Downstate reduces the level of veterinary assistance to researchers on behalf of safety and animal welfare, since the offsite consulting veterinarian has a fulltime job in another state and limited availability. Upon

information and belief, the arrangements made by defendant Stewart, even if they satisfy federal documentation requirements, do not satisfy the obligation to provide animal care/welfare in the course of ongoing studies and the summary replacement of plaintiff by a consulting veterinarian increases the danger and risk of injury to animals and humans.

96.     Upon information and belief, SUNY and its administrators had and continue to have the responsibility to support the veterinary oversight role and specifically to support ongoing improvements in the animal care and use program through the development and implementation of procedures and policies (for example, IACUC guidelines) which enhance animal health, as well as to provide the Attending Veterinarian appropriate authority to execute a program of adequate and appropriate veterinary care.

97.     Upon information and belief, SUNY and its administrators have abdicated their responsibility to support the veterinary function at SUNY Downstate.

**Defendants' Actions Were Motivated by Retaliatory Animus**

98.     Upon information and belief, plaintiff was not terminated for deficiencies in her performance.

99.     Upon information and belief, defendants' actions were motivated by retaliatory animus.

100.    Defendants SUNY and SUNY Downstate have encouraged, condoned and/or approved the acts of the individual defendants.

101.    Defendants SUNY and SUNY Downstate are liable for the acts taken by their employees, who were acting within the apparent scope of the authority entrusted to them by the institutional defendants.

102.    Defendants have acted willfully, intentionally and with malice, entitling plaintiff to punitive damages against the individual defendants.

103.    As a result of defendants' acts, plaintiff has suffered and continues to suffer injuries and damage, including economic loss, including back pay and future lost earnings and benefits, as well as damage to her personal and professional name, profession, career and reputation, mental and physical pain and suffering, emotional distress and mental anguish, embarrassment, indignity, inconvenience, and substantial dislocation in her personal and professional life.

**Irreparable Harm**

104.    The consulting veterinarian who has taken over plaintiff's duties has a full time job in New Jersey and is scheduled to be at the SUNY Downstate animal facility only 1 time a week for approximately 1-2 hours. The animal facility and animal research program at Downstate requires 2 full time veterinarians, one as the Director of DCM and Attending Veterinarian and one as the clinician for the animals with the primary goal of ensuring the well-being and reducing the pain and suffering of animals being used as subjects on IACUC reviewed and IACUC approved research studies. Plaintiff has been performing both roles until the open full time clinical veterinarian position is filled.

105.    Defendant Stewart as Institutional Official did not consult or notify the IACUC when he decided to remove plaintiff as the fulltime veterinarian to replace her with a 1-2 hour a week veterinarian not familiar with the current program. The IO is ultimately responsible for compliance with the NIH policy, and the Animal Welfare Act CFR. In violation of policy, he has significantly modified the program of Veterinary care to provide extremely limited resources, less than what is currently required to adequately provide for animal welfare on a daily basis.

106.    Plaintiff believes that the end result of this unnecessarily precipitous action removing plaintiff from her responsibilities will be harm to the animals and that it may well result in the suspension of SUNY Downstate animal research.  Based on recent history, which can be supported with documentation and photographs, possible harms include but are not limited to the following:

(a)     Failure to identify and remediate environmental conditions in animal housing rooms that jeopardize the health or well-being of animals housed therein;

(b)     Conduct of animal-related activities by research personnel without appropriate IACUC review and approval;

(c)     Failure of faculty and research lab personnel to adhere to IACUC-approved protocols when working on animals or removing them from their housing;

(d)     Research personnel making significant changes to their animal procedures without prior IACUC approval;

(e)     Conduct of animal-related activities by faculty and research personnel beyond the protocol expiration date established by the IACUC;

(f)     Chronic failure of researchers to provide space for animals in accordance with recommendations of the Guide, to the degree that immature animals are harmed and killed;

(g)     Participation in animal-related activities by individuals who have not been appropriately trained thereby causing unnecessary animal pain and suffering;

(h)     Failure to monitor animals after surgical and invasive procedures as needed to ensure administration of relief from pain and suffering;

(i)     Failure of research personnel to maintain appropriate animal-related records as required by Federal and State animal welfare laws, regulations, policies and guidelines (e.g., identification, medical, husbandry);

(j)     Failure of research personnel to ensure death of animals after euthanasia procedures;

(k)     Failure of research or animal care and use personnel to identify the need for veterinary care in a timely manner;

(l)     Failure of research or animal care personnel to carry out veterinary treatments;

(m)   Fear of animal care staff to report animal welfare concerns to the defendants because they may face retaliation by defendants;

(n)   Dangerous and potentially harmful message being given to animal care staff and the public that researchers at SUNY Downstate are no longer concerned about animal welfare;

(o)   Lack of on-site experienced supervision of the animal care and veterinary staff potentially resulting in a diminished quality of their daily animal care/welfare activities.

107.   Given the history of compliance issues at SUNY Downstate, including the individual defendants' opposition to plaintiff's efforts to ensure compliance with applicable animal welfare regulations, plaintiff is concerned that one reason defendants acted as precipitously as they did is to remove her from her position prior to the upcoming AAALAC accreditation for which SUNY Downstate is now preparing.

108.   SUNY Downstate is an AAALAC-accredited facility and has been one since 1966. AAALAC site visitors have in the past met separately with plaintiff as the Attending Veterinarian and also with the IACUC Chair.  AAALAC has, in the past, assisted the Attending Veterinarian and IACUC Chair in addressing deficiencies in faculty oversight. It is plaintiff's belief that the upcoming AAALAC site visit is being resisted by the defendants since the AAALAC site visit serves as oversight beyond the defendants self-reporting. Upon information and belief, defendants are concerned that plaintiff will disclose noncompliance to date. Her office has abundant evidence of noncompliant care/protocol discrepancies documented and needing resolution.  It is her belief that defendants want to have another veterinarian in the position who is less familiar with noncompliance issues and more willing to protect faculty, as opposed to animals, on compliance issues.

109.    Plaintiff's staff on site at the Downstate animal facility has expressed concerns about the absence of a full time veterinarian. Among other concerns, they have raised issues relating to not being able to identify health concerns of monkeys on HIV-vaccine studies as needed and not being able to properly review and screen health information of incoming monkeys to meet both NYS and research requirements. They are concerned about the lack of animal use tracking on protocols by faculty and uncontrolled and unmonitored breeding of mice, resulting in severe overcrowding of animals and the unnecessary euthanasia of large numbers of animals as a result.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourteenth Amendment Property Interest

110.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

111.    Plaintiff's contractual right, employment, entitlement, expectation and/or license to work as Attending Veterinarian and Director, Division of Comparative Medicine constituted a property interest protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

112.    Defendants barred plaintiff from her work site at SUNY Downstate and removed plaintiff from her positions as Attending Veterinarian and Director, Division of Comparative Medicine without notice or opportunity to be heard.

113.    Defendants' processes and actions do not provide for an impartial decision maker.

114.    In their actions, defendants deprived plaintiff of her right under the Fourteenth Amendment to be free from the deprivation of property without due process.

115.    In their actions, defendants acted in bad faith and under color of law.

116.    As a direct and proximate result of being denied her constitutional right to be free from the deprivation of property without due process, plaintiff has suffered injuries and damages.

117.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourteenth Amendment Liberty Interest

118.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

119.    Plaintiff has a liberty interest protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution in her employment, right, entitlement, expectation and/or license to work as Attending Veterinarian and Director, Division of Comparative Medicine.

120.    Plaintiff also has a liberty interest protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution to her good name and reputation.

121.    In addition to wrongfully depriving plaintiff of her property and liberty interest in her employment as Attending Veterinarian and Director, Division of Comparative Medicine., defendants stigmatized plaintiff, characterizing her as "Persona Non Grata" and calling into question her good name, reputation, honor and integrity.

122.    Plaintiff's ability to practice her profession as a veterinarian without the stigma of false and defamatory allegations and characterizations, and the removal of plaintiff from her positions as Attending Veterinarian and Director, Division of Comparative Medicine, constitutes a liberty interest protected by the Due Process Clause of the Fourteenth Amendment.

123.    By virtue of their false and defamatory accusations and their removing plaintiff from her positions, defendants deprived plaintiff of her liberty interests under the Fourteenth Amendment without due process.

124.     In committing the acts complained of herein, defendants acted in bad faith and under color of law.

125.     As a direct and proximate result of being denied his constitutional right to be free from the deprivation of liberty without due process, plaintiff has suffered the injuries and damages.

126.     The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 – Fourteenth Amendment Substantive Due Process

127.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

128.     Defendants' summary bar from the work place and removal of plaintiff from her positions as Attending Veterinarian and Director, Division of Comparative Medicine violated plaintiff's right to substantive due process under the Fourteenth Amendment to the United States Constitution.

129.     Additionally, defendants violated plaintiff's right to substantive due process under the Fourteenth Amendment by falsely accusing her of committing wrongful acts in the course of her duties as Attending Veterinarian and Director, Division of Comparative Medicine and removing plaintiff from her positions without notice or opportunity to be heard to contest the removal.

130.     Defendants' acts were outrageously arbitrary, oppressive, and conscience-shocking as to constitute a gross abuse of governmental authority.

131.     In committing the acts complained of herein, defendants acted in bad faith and under color of law.

132.    As a direct and proximate result of being denied her constitutional right to be free from the deprivation of property without due process, plaintiff has suffered injuries and damages.

133.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983 – First Amendment

134.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

135.    Defendants retaliated against plaintiff because of her efforts to enforce compliance with applicable federal and state law relating to animal welfare.

136.    In their actions, defendants violated plaintiff's rights under the First Amendment of the United States Constitution

137.    In committing the acts and omissions complained of herein, defendants acted in bad faith and under color of law.

138.    As a direct and proximate result of being denied her constitutional rights under the First Amendment, plaintiff has suffered injuries and damages.

139.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

## FIFTH CAUSE OF ACTION
### Violations of New York State Constitution

140.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

141.    By subjecting plaintiff to the foregoing acts and omissions defendants violated plaintiff's right to due process guaranteed by Article I, § 6 of the New York State Constitution,

and plaintiff's right to freely speak, assemble, and associate as guaranteed by Article I, §§ 8 and 9 of the New York State Constitution.

142.    As a direct and proximate result of defendants' deprivation of plaintiff's rights, privileges, and immunities guaranteed by the New York State Constitution, plaintiff suffered injuries and damages.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of New York State Labor Law

143.    Plaintiff realleges and incorporates by reference each and every allegation set forth above as if fully set forth herein.

144.    Section 740 of the New York Labor Law prohibits an employer from taking retaliatory action against an employee for disclosing or threatening to disclose to a supervisor or public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or for objecting to or refusing to participate in any such activity, policy or practice.

145.    Plaintiff disclosed to supervisors, including the IACUC/UAWC, the Institutional Official, and the individual defendants, activities, policies and practices of and at defendant SUNY which were in violation of law, rule and/or regulation.

146.    Plaintiff disclosed to a governmental agency activities, policies and practices of and at SUNY Downstate which were in violation of law, rule and/or regulation.

147.    Plaintiff objected to and refused to participate in activities, policies and practices of and at SUNY Downstate which were in violation of law, rule and/or regulation.

148.    The activities, policies and practices plaintiff disclosed and objected to constituted violations of federal law, including the Animal Welfare Act, 7 U.S.C. § 2131 et seq. and the Health Research Extension Act of 1985, 42 U.S.C. § 275 et seq., the policies of the Department of Health

and Human Services, 48 C.F.R. 370.401-402, as well as violations of state law, including New York Public Health Law § 504 and 10 NYCRR Part 55.

149.     The violations of law described above created and presented a substantial and specific danger to the public health or safety.

150.     The violations of law described above constitute activities, policies or practices of defendant SUNY.

151.     Defendants retaliated against plaintiff as described above because of plaintiff's disclosure of and objection to activities, policies and practices that were in violation of federal and state law, rule and/or regulation and which created and presented a substantial and specific danger to the public health and safety.

152.     Defendants' acts as described above constitute unlawful retaliatory personnel action against plaintiff in violation of Section 740 of the New York Labor Law.

153.     By reason of the foregoing, plaintiff has suffered injuries and harm and is entitled to relief pursuant to §§ 740(4) and (5) of the New York Labor Law.

### EIGHTH CAUSE OF ACTION
### Retaliation in Violation of New York Civil Service Law § 75-b

154.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

155.     Defendants retaliated against plaintiff in violation of the New York Civil Service Law § 75-b for making protected complaints concerning improper governmental actions including, inter alia, policies and practices in violation of the Animal Welfare Act, 7 U.S.C. § 2131 et seq. and the Health Research Extension Act of 1985, 42 U.S.C. § 275 et seq., the policies of the Department of Health and Human Services, 48 C.F.R. 370.401-402, as well as violations of state law, including New York Public Health Law § 504 and 10 NYCRR Part 55.

## NINTH CAUSE OF ACTION
### Breach of Contract and SUNY Policies

156.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

157.     Plaintiff has in all respects performed all duties under her employment contract.

158.     In their actions, defendants breached plaintiff's employment contract and plaintiff's contractual rights under the Policies of the SUNY Board of Trustees applicable to SUNY term appointments.

159.     As a direct and proximate result of defendants' conduct, plaintiff suffered the injuries and damages set forth above.

## TENTH CAUSE OF ACTION
### Tortious Interference with Contract

160.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

161.     Plaintiff was employed by SUNY.

162.     Plaintiff had a term employment contract with SUNY.

163.     The individual defendants were aware of plaintiff's employment and contractual relationship with SUNY.

164.     In committing the foregoing acts and omissions, defendants intentionally and/or recklessly interfered with and/or caused the breach of plaintiff's employment contract with SUNY.

165.     As a result of defendants' acts and omissions, plaintiff suffered the injuries and damages set forth above.

## ELEVENTH CAUSE OF ACTION
### Defamation

166.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

167.    Defendants have made false and defamatory statements about plaintiff.

168.    Defendants have characterized plaintiff as a "Persona Non Grata."

169.    Defendants have stated that plaintiff assaulted staff member(s).

170.    Defendants have published these false, misleading, and defamatory statements to third parties, including but not limited to other members of plaintiff's staff.

171.    Defendants had no privilege or authorization to publish these false and defamatory statements.

172.    In publishing false, misleading, and defamatory statements, defendants acted intentionally, recklessly, or at the very least negligently.

173.    These false, misleading, and defamatory statements were intended to and did injure plaintiff in her trade, business or profession.

174.    As a consequence of defendants' having published these false, misleading, and defamatory statements, plaintiff has sustained injuries and special damages, including removal from her positions as Attending Veterinarian and Director, Division of Comparative Medicine, likely termination of her employment contract, likely termination of her employment, loss of future employment, lost salary, and inability to work within the SUNY system.

175.    As a result of defendants' acts and omissions, plaintiff suffered the injuries and damages set forth above.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff respectfully requests the Court to award her the following relief:

(a)     Judgment declaring that defendants' acts complained of herein violated plaintiff's rights under the Fourteenth Amendment to the United States Constitution and the New York Constitution;

(b)     Judgment declaring that defendants' acts complained of herein violated plaintiff's rights as secured by applicable state and local law prohibiting retaliation in employment;

(c)     An Order restoring and reinstating plaintiff to her positions of Attending Veterinarian and Director, Division of Comparative Medicine with full salary, benefits, responsibilities, perquisites, seniority and other rights and responsibilities;

(d)     An Order enjoining and restraining defendants  from continued violation of law, specifically including Section 740 of the New York Labor Law;

(e)     Appropriate back and/or front pay and/or future lost earnings including benefits;

(f)     Compensatory damages to compensate plaintiff for damage to name, profession, career and reputation, pain and suffering, emotional distress and mental anguish, embarrassment, indignity and dislocation, as well as loss of employment and employment-related perquisites at SUNY;

(g)     Punitive damages against the individual defendants;

(h)     Reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and Labor Law 740, together with costs and disbursements of this action;

(i)     Pre- and post-judgment interest to the extent allowable by law; and

(j)     Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: New York, New York
        March 1, 2017

BELDOCK LEVINE & HOFFMAN LLP

By:_____
        Cynthia Rollings
*Attorneys for Plaintiff*
99 Park Avenue
New York, New York 10016
(212) 490-0400